# EXHIBIT A

# **EXPERT REPORT**

**Real Estate Expert Witnesses, LLC**
**Jeffrey S. Rothbart**

**J.G. Wahlert**

**Plaintiff**

**v.**

**Kovitz Shifrin Nesbit, a Professional Corporation,**
**Kalman Management Inc., and Loch Lomond Property**
**Owners Association**

**Defendants**

**United Stated District Court**
**Northern District of Illinois**
**Eastern Division**
**Case :17-cv-08055**

**October 19, 2020**

Real Estate Expert Witnesses, LLC ("REEW"), by and though Jeffrey S. Rothbart its Managing Member, has been retained as an expert witness in the area of title document review, easement modification and the conditions of formation and/or modification of a property owners association.

As discovery is ongoing, I reserve the right to update, revise, or change any information or opinions contained herein.

**REEW & JEFFREY ROTHBART:**

1. Mr. Rothbart has over 17 years of institutional, commercial and residential real estate experience including, but not limited to, valuation, acquisitions, development, general contracting, equity and debt financing and lending standards, asset/portfolio management, capital markets, leasing, dispositions, sustainability and brokerage.

2. Over the course of his career, Mr. Rothbart has participated in over $3 billion worth of commercial and residential real estate transactions, across property types, geography and risk profile.

3. Mr. Rothbart published over 40 articles and research reports on the commercial real estate markets which were cited in over 100 different real estate publications.

4. Mr. Rothbart has also consulted, either as an expert witness or on a third-party basis, in over 45 matters. Previous clients include municipalities, public REITs, governmental agencies, universities, insurance companies, creditors to bankruptcy, equity investors, developers, property owners, tenants and individual homeowners.

5. Mr. Rothbart has a B.A. from Emory University, a J.D. from IIT-Chicago Kent College of Law, LL.M. in Taxation from Northwestern University and a Certificate in Hotel Real Estate and Asset Management from Cornell University.

6. Additionally, Mr. Rothbart is an Adjunct Professor of Law at IIT-Chicago Kent College of Law, a licensed Illinois attorney, a licensed Illinois Real Estate Broker, a LEED-AP for New Construction v2.2 and formerly held NASD/FINRA Series 22 and 63 licenses. Finally, Mr. Rothbart has been a 'market participant' for the PwC Korpacz Real Estate Investor Survey for over 14 years.

7. A complete CV, prior testimony and article list is attached hereto as Exhibit A.

**DOCUMENTS REVIEWED:**

1. February 2, 2019 Memorandum Opinion and Order (the "2019 Memorandum Opinion and Order);
2. Amended and Restated Declaration of Restrictions and Easements for Loch Lamond Property Owners Association (the "Newly Formed POA");
3. Declaration of Restrictions and Easements Document Book 1243, Page 84-88,92 ("Doc. 1243");

4. Declaration of Restrictions and Easements Document Book 1366, Page 63-70 ("Doc. 1366");
5. Declaration of Restrictions and Easements Document Book 1432, Page 292-300 ("Doc. 1432");
6. Recorded Document Book 1876, Pages 529-532 ("Doc. 1876");
7. Recorded Document 2128748 ("Doc. 2128748");
8. Recorded Document 2087334 ("Doc. 2087334");
9. Recorded Document 2413895 ("Doc. 2413895");
10. That certain First Amended Complaint and all exhibits thereto (the "FAC");
11. IICLE 10S Cooperative, Condominium and Homeowners' Association Litigation by Jordan Shifrin, Kovitz Shifrin Nesbit 2010. (the "2010 IICLE");
12. State of Illinois Certificate #8531 (the "Incorporation Document");
13. KSN Letter dated November 7, 2016 and corresponding attachments (the "Nov KSN Letter");
14. Lakeland Property Owners Association v. Larson, 121 Ill.App.3d 805, 77 Ill.Dec. 68 (1984).;
15. LLPOA Partial Timeline (see www.llpoa.org) ("LLPOA Timeline"); http://nebula.wsimg.com/ace62166fc23dec44a70f235c8285930?AccessKeyId=12DCEBB2971B825E01B7&disposition=0&alloworigin=1);
16. Plaintiffs Response to Defendants KSN's First Set of Interrogatories ("KSN Rogs"); and
17. Wahlert's responses to Interrogatories to all Defendants.

**DEFINED TERMS:**

1. The "Development Easements" shall be defined as Doc. 1243, Doc. 1366 and Doc. 1432 cumulatively'
2. "Kalman" shall be defined as Kalman Management, Inc.;
3. "KSN" shall be defined as Kovitz, Shifrin Nesbit, a Professional Corporation;
4. "LLPOA" shall be defined as the Loch Lomond Property Owners Association; and
5. "McIntosh" shall be defined as Arthur T. McIntosh & Company.

**TIMELINE OF CRITICAL EVENTS:**

1. 1954 to 1956 – The subdivision was developed by McIntosh as three separate subdivisions. As part of the three-part subdivision development process, the Development Easements were issued. The Development Easements neither "required payment of any assessments to use the easements"[1] nor did they require membership in any association.

2. August 2, 1957 – The LLPOA was incorporated, a non-profit organization, by ten individual lot owners. These owners owned less than 2% of the 561 residential lots.[2] Pursuant to the Incorporation Document the purpose of the LLPOA was "to promote the civic, educational, patriotic, economic, social and charitable purpose of the community known as Loch Lomond, to bring together the members of said community to the end that the strength of their common efforts and unity will result in benefit to all."

---

[1] 2019 Memorandum of Opinion and Order
[2] LLPOA Timeline

3. August 9, 1961 – Pursuant to Doc. 1876, McIntosh quit claimed to the LLPOA all of its interest in the lake subject to the Development Easements.

4. 1963 to 1979 – The "LLPOA filed Annual Reports with the Illinois Secretary of State without claiming that it was a homeowners' association or that it was maintaining the lake or the parks."[3]

5. January 29, 1980 – Document 2087334 is executed. This document reconfirmed the Development Easements and stated in relation thereto "nor anything in this instrument or in any recorded plat of subdivision contained, shall be deemed or construed to impose upon the [LLPOA] or its successors or assigns, from time to time of said Lake, any duty to maintain said Lake in its present, or any other size, depth or condition."

6. July 14, 1981 – Doc. 2128748 is executed. Doc. 2128748 states "each and every individual property owner, their heirs and assigns, shall be **entitled** to membership in the [LLPOA]." [Emphasis Added].

7. October 15, 2015 – KSN and the LLPOA recorded the Newly Formed POA.[4]

**EXPERT OPINIONS AND ADDITIONAL FACTUAL INFORMATION:**

At no point, has the LLPOA either been incorporated by nor approved as an association by all members it seeks to enjoin. According to Jordan Shifrin, a named principal with KSN:

> "in order to create a cooperative, condominium, or homeowners' association, there must be an unanimous subscription to an underlying document by the owners of the property – a charter, bylaws, a trust agreement and/or proprietary lease (co-op), or a recorded set of covenants and bylaws that run with the land. Anything less creates a 'voluntary' association in which membership is not mandatory and rules are not enforceable against nonmembers."[5]

The LLPOA was formed by only ten (or a mere 2%) of the homeowners it seeks to effect. Therefore, based on KSN's own interpretation of Illinois law, from its origination the LLPOA was a voluntary association whose rules were never intended to be applied to nonmembers. This was true as recently as 1981 when Doc. 2128748 was recorded and said that property owners are "entitled" to join, stating again that enrollment was voluntary rather than mandatory.

Therefore, pursuant to Illinois association law and KSN's own words, the LLPOA has no legal authority to enjoin the Plaintiff. Both KSN and the LLPOA knew, or reasonably should have known, of this simple fact. Notwithstanding, by and through their conduct, KSN and the LLPOA modified the terms of the property owners association (and thus modified the Development Easements) without unanimous consent of those affected; thereby, seeking to enjoin the Plaintiff, and the class, as part of the LLPOA when the Plaintiff, and the class, never subscribed to the same.

---

[3] LLPOA Timeline
[4] Complaint Paragraph 3
[5] The 2020 IICLE

It is based on this lack of unanimous consent, which is typically required by law, that makes the Newly Formed POA an "illegal" document based on prevailing market standards. It is on this basis, that the Plaintiff and the class should be entitled to relief.

As stated above, none of the Development Easements "required payment of any assessments" to use either the park or lake easements. This is (and should be) the baseline that any subsequent easements and associations, and specifically the Newly Formed POA, are compared against.

1. **_The Modification of the LLPOA by the recordation of the Newly Formed POA was akin to the creation of a new "HOA/POA" and as a result materially modified the Development Easements and therefore was the proximate cause of damages sustained by the Plaintiff._**

By filing the Newly Formed POA, the Defendants created a new, so-called "homeowners association" which by its content modified the Development Easements. The Newly Formed POA was not an amendment of the existing LLPOA incorporation documents but the formation of new, alleged property owners association. The Newly Formed POA provided significantly more rights and burdens to the association and homeowners, respectively, than had ever existed prior thereto. The change in the scope and scale from the pre-Newly Formed POA to the post-Newly Formed POA is material and therefore the modifications should constitute more than a mere amendment thereto.

As stated therein, the Newly Formed POA was adopted pursuant to, allegedly, only a vote of two-thirds of the owners. Therefore, pursuant to KSN's own interpretation of Illinois law which is stated above, the association should remain voluntary. Again, for a party to subscribe to an association, that subscription must be voluntary. Recall again that this was the baseline established by the Development Easements as the LLPOA was originally formed by only 2% of those it seeks to enjoin.

Notwithstanding its own legal interpretation of Illinois law, KSN drafted Article III, Section 2 of the Newly Formed POA to state that "every Owner of a Dwelling or Lot is hereby declared to be a Member of the Association" and pursuant to Article III, Section 4 "the provisions of this Article shall be mandatory. No owner of any interest in any Lot or Dwelling shall have any right or power to disclaim, terminate or withdraw from his Membership in the Association or any of his obligations as such Member…"

These terms and conditions are not possible without consent of all those to be enjoined! As all members sought to be enjoined have failed to join the LLPOA membership, pursuant to KSN's own interpretation of Illinois law, the actions undertaken in the Newly Formed POA created a voluntary association. At the bare minimum, it would be expected that the Newly Formed POA would have been approved by 100% of the owners it sought to enjoin, but it wasn't. it was only approved by, allegedly, two-thirds, thus reinforcing the creation of a voluntary association.

As referenced above, in addition to creating a purported, new property owners association via the Newly Formed POA, KSN attempted to make a series of back-door modifications to the Development Easements.

The third recital to the Newly Formed POA states the LLPOA is "incorporated under the laws of the State of Illinois to administer and enforce the covenants, conditions, restrictions, easements, charges and liens as delineated in this Declaration." This power, to administer and enforce easements, is one that the LLPOA never had pursuant to the baseline, Development Easements and thereby should constitute an amendment to the Development Easements. Property Law 101 states that all parties subject to an easement need to consent to its modification. That did not occur in the instant matter.

Moreover, Article VI, Section 1 went so far as to create a lien against nonmembers property in the event the assessments (which are now claimed to be mandatory) are not paid. Article VI, Section 1 states "each Owner of a Dwelling or Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance for each Dwelling or Lot owned by such Owner, hereby covenants and agrees and shall be deemed to coved any and agree to pay the Association such assessments as are levied pursuant to the provisions of this Declaration." The rights sought by the LLPOA in the Newly Formed POA are even so egregious as to call for forcible detainer in the event of non-payment of fees.

This language is directly contradictory to the Development Easements and was not authorized or approved by 100% of the parties to be enjoined by the same.

The proximate result of the illegal filing of the Newly Formed POA is damages in three forms. First, the property is subject to the false, Newly Formed POA which has created a slander on title and which should be unrecorded, along with all fees and liens. Second. there is a loss of use and enjoyment of easement due to the Defendant's actions of blocking off access to the lake/parks and finally there is the reduction in the value of class members properties due to the assessment charges.

As stated above, the Newly Formed POA should never have been filed and recorded. The Defendants all knew, or reasonably should have known, that they did not have unanimous consent to expand the class of those enjoined by the Newly Formed POA. As such, and based on industry custom, standards and experience, the Defendants created a slander of title against the property. Therefore, the first and foremost remedy that should be available to Plaintiff and the class is to have the Newly Formed POA removed from title as well as all association dues and liens created thereby. This will clear the title report of the slanderous actions against title. The further result of the Defendants slander of title actions is that the property is unsellable without payment of the association dues, either by an active seller or a seller's estate. It is highly unlikely that a title company would insure over this encumbrance and therefore it would need to be addressed before a warranty deed could be provided. REEW does not believe it would be realistic that a home purchaser would accept a quit claim deed so as to avoid insuring over title objections. Therefore, the Newly Formed POA is the equivalent to a false mechanics lien and is prohibiting the disposition of the property.

The second corresponding damage, in REEW's expert opinion, is that the Plaintiff and class members were denied, based on the overt actions of the Defendants, access to the lake and parks

to which they are otherwise entitled pursuant to the Development Easements. The Defendants have blocked off access with gates and other security measures.

The nearby Gages Lake which is North of the Loch Lomond lake charges $10-a-day for day passes. Similarly, the Lake Julian Trout Farm, which is approximately 16 miles away, and a 1/2-hour drive, charges $10 per day as well. Therefore, in REEW's expert opinion, a reasonably proxy to determine the amount of this damage for loss of the easement is $10 per day for each class member over the five-year statutory period. Access to a private lake is valuable and buyers in the marketplace will pay more for a home with riparian rights than one without.

The final measure of damages, in REEW's expert opinion, is the abatement in the value of the Plaintiff's and class members residences based on the improper assessment. Based on industry custom, standards and experience as a residential broker (with additional experience selling residential property subject to an HOA), REEW's opinion is that the assessment levied decreases the available funds that purchasers have to allocate toward their mortgage, tax and insurance payments. As of October 15, 2020, mortgage APR rates for a 30-year fixed rate mortgage are approximately 3.30%.[6] At $350 per year, the LLPOA assessment reduced the value each home in the class by $10,606 ($350 divided by 3.30%), or 10% more purchasing power. This would be $350 extra that could have gone toward the mortgage payment and instead of purchasing a $100,000 home, they would be able to purchase a home for $110,606. Purchaser's of residential real estate only have so many dollars on a monthly basis to allocate toward living expenses. Through the Defendants actions to knowingly create false assessments they caused a material decrease in the value of the Plaintiffs and class residence. These damages apply regardless of the location within the development or the value of the home.

Finally, the statements made by the Defendants in the collection letter are false and misleading, and intentionally so based on KSN's comments in the 2010 IICLE.

**CONCLUSIONS:**

1. The LLPOA is a voluntary association which was formed by only 2% of the properties it seeks to enjoin;

2. At no point, were the bylaws of the LLPOA ratified by all parties that the LLPOA seeks to enjoin;

3. By filing the Newly Formed POA, the Defendants materially expanded the rights and powers of the LLPOA without consent of all parties sought to be enjoined;

4. By filing the Newly Formed POA, the Defendants created a "back door" modification to the Development Easements without consent of all parties subject to the Development Easements; and

---

[6] https://www.bankrate.com/mortgages/refinance-rates

-8-

5. By and through the recordation of the Newly Formed POA, the Defendants have damaged the Plaintiff through slander of title, lack of access to the easement areas and diminution in the value of Plaintiffs' residence, for each member of the class.

_____
REAL ESTATE EXPERT WITNESSES, LLC
By: Jeffrey S. Rothbart
Date: October 19, 2020