IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J.G. WAHLERT on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.  17 C 8055 |
| v. | ) ) ) | Judge Robert W. Gettleman |
| KOVITZ SHIFRIN NESBIT, a professional corporation, KALMAN MANAGEMENT, INC., and LOCH LOMOND PROPERTY OWNERS ASSOCIATION, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff J.G. Wahlert, on behalf of himself and all others similarly situated, brought a six count amended putative class action complaint against defendants Kovitz, Shifrin, Nesbit ("KSN"), Kalman Management, Inc. ("Kalman"), and the Loch Lomond Property Owners Association, ("LLPOA").   Count I asserts a violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1 et seq. against all three defendants. Counts II and III, also brought against all three defendants, allege claims for "tortious interference" and private nuisance.   Count IV is brought against LLPOA and KSN for slander of title.   Count V alleges trespass to easement against Kalman and LLPOA, while count VI is brought solely against KSN for violation of the Fair Debt Collection Practices Act ("FDCPA"). Kalman answered the amended complaint, while KSN and LLPOA moved to dismiss the counts brought against them.   On February 7, 2019, the court dismissed counts I-IV as to KSN, leaving only count VI (for violating the FDCPA) against KSN.[1]   The court also granted LLPOA's motion

---

[1] The court held that count I failed to state a claim because plaintiff's claims do not involve trade or commerce or a real estate transaction, and do not satisfy the "consumer nexus test."   [Doc. 93 at 8-9].   The court dismissed count I in

as to count I only, leaving counts II-V against it [Doc. 93]. KSN has now moved for summary judgment on count VI, and Kalman and LLPOA have moved for summary judgment on counts II-V. For the reasons described below, those motions are denied.

## **BACKGROUND**

In the 1950s, Arthur T. McIntosh & Co. developed property in Mundelein, Illinois for the purpose of selling homes around a man-made lake it called Loch Lomond Lake and two parks. The company recorded three documents entitled "Declaration of Restrictions and Easements," in 1954, 1955, and 1956. Each of those recorded documents listed restrictions on each lot in the subdivision that were to be construed as covenants that ran with the land until 1980, at which time "any and all such restrictions may be extended to continue in effect beyond January 1, 1980, by the owner or owners of two-thirds (2/3) in number of said lots in the subdivision . . .." Those restrictions basically dealt with the types of buildings that could be built on the land.

The three recorded documents also listed rights and easements granted to owners of the lots. The documents granted lot owners a perpetual easement "in, upon, and across the Lake and Parks," subject to "reasonable regulations by the owner or owners from time to time of said Lake or Parks." The documents also provided that "neither the grant of such easements . . ., nor the use of said Lake [or Parks] by the grantees of such easements, nor anything in this instrument or in any recorded plat of subdivision contained, shall be construed to impose upon the undersigned or its successors or assigns, or the owner or owners from time to time of said Lake [or Parks], any duty to maintain said Lake [or Parks] in its present, or any other, size depth, or condition."

---

its entirety, including the claim against Kalman. The FDCPA claim against KSN constitutes the basis for federal jurisdiction in this case.

Finally, all three recorded documents granted the developer or its successors or assigns the "right to convey the Lake [or Parks] or any part or parts thereof, to any association or group of property owners organized for the purpose of acquiring and holding title to the Lake [or Parks]. Any such conveyance shall be made subject to the easements and rights declared, granted and reserved in this instrument."

In 1957, the LLPOA was chartered and incorporated by ten of 561 lot owners. As listed in the Articles of Incorporation, its purpose was "to promote the civic, education, patriotic, economic, social and charitable purposes of the community known as Loch Lomond, to bring together the members of said community to the end that the strength of their common efforts and unity will result in greater benefit to all."

Four years later, in 1961, McIntosh Co. transferred title to the lake and parks to the LLPOA, subject to the same rights and easements in the original declarations. There were no changes to those rights and easements, no mention of Home Owner Association ("HOA") fees, assessments, or new restrictions or regulations. McIntosh retained the right to take back title if the LLPOA authorized or permitted use of the premises or any part by any person other than the owners and occupants of the lots and parcels of real estate described in the declarations. From 1963 through 1979, the LLPOA filed annual reports with the Illinois Secretary of State without claiming that it was an HOA or that it was maintaining the lake or parks.

In 1980 the LLPOA recorded an "Agreement to Extend the Declaration of Restrictions and Easements" (the "1980 Extension"). This agreement was signed by 2/3 of the property owners, and extended the original restrictions and easements contained in the original declarations, subject to the same conditions. The agreement repeated the same language in the original declarations

3

indicating that the owners of the lake and parks were under no duty to maintain them. The agreement was not signed by all property owners and contained no language purporting to add any additional restrictions on the use of the lake or parks. Specifically, the agreement contained nothing about HOA fees or assessments.

      Nonetheless, sometime after the 1980 recording, the LLPOA began to attempt to collect assessments from the property owners. It also created a welcome letter sent to new owners, indicating that the title to the lake belongs to the LLPOA "with conditions which were set up by the Arthur T. McIntosh Company when this subdivision was developed. A principal condition was that title would continue to belong to the Association so long as the lake is properly maintained. . . . . To satisfy this requirement, the LLPOA has voted into effect rules covering the use of the lake and beaches over the years," one of which is that "[a]ll residents are required to pay dues or a lien may be placed against your property and the outstanding balance shall bear interest." These same representations were posted on the LLPOA website. As noted above, however, no such condition to maintain the lake was ever placed on the LLPOA. In fact, the declarations specifically indicated that the owner had no duty to maintain the lake.

      In 1986 the LLPOA recorded a document titled "Loch Lemond Property Owners Association Public Notice of Annual Assessment." This document indicated that the current By-Laws of the LLPOA provided that "Beginning with the 1983 assessment, when property is sold by a property owner not in good standing because of non payment of assessment, the payment of the 1983 assessment and subsequent assessments as they become due shall be a condition to access to and use of the Association's real property and appurtenances thereto by the new owner." By the recording, the LLPOA purported to give notice that it owned the lake, beach and park areas and

4

that "access to, use of and enjoyment of said lake, parks and beaches, is restricted only to those whose assessments are currently paid, and therefore are members in good standing of the [LLPOA]."

Plaintiff purchased his property in the Lake Lomond subdivision in 1991. At the time he purchased the property he was told by someone purporting to be an official of the LLPOA that all property owners were automatically members of the LLPOA and had to pay $220 in annual dues because the LLPOA was maintaining the lake. His deed to his home provides that he purchased his property "subject to . . . covenants and conditions of record." At that time the original declarations, the 1980 Extension, and the 1986 Notice of Public Assessment had all been recorded.

By 2008, plaintiff had paid approximately $4600 in assessments from 1981 to 2008, and had access to and use of the lake and parks. Starting in 2008 plaintiff stopped paying assessments, believing that there had been a fraud by the LLPOA because it had no right to collect assessments. In a November 2008 newsletter, based on advice from KSN, the LLPOA told owners that: a) "we cannot collect back dues in a collection notice fashion"; b) the LLPOA cannot put a lien on property for not paying back dues; and c) "we would probably lose if we took a resident to court to collect back dues. We can not change the covenant without every person in the Association Agreeing to it."

On January 12, 2001, the LLPOA recorded a document entitled "Bylaws of Loch Lomond Property Owners Association." These bylaws indicate that the LLPOA's charted purpose was to "administer and enforce" any "covenants, restrictions, easements, charges, and liens," and to "maintain the Lake." As noted above, this was not part of its original chartered purpose, and there

5

was, at that time, no recorded document providing that the LLPOA had any right or duty to enforce the covenants.

In 2011, plaintiff sued the LLPOA in the Circuit Court of Lake County, Illinois, seeking a declaration that the LLPOA is a voluntary membership association and is not empowered to assess dues against plaintiff or obstruct plaintiff's exercise of his easement rights or threaten to or file liens against plaintiff's property for failure to pay dues. That case was ultimately voluntarily dismissed.

Finally, in 2015, the LLPOA recorded a document prepared by KSN and titled "Amended and Restated Declaration of Restrictions and Easements for Loch Lomond Property Owners Association." This document, which forms the basis of plaintiff's present claims, adds new covenants and purports to declare that every owner of a dwelling or lot to be a member of the LLPOA, that the provisions are mandatory, and that and that no owner shall have the right or power to disclaim, terminate or withdraw from membership in the LLPOA or any of his obligations as such member. Contrary the notice sent to homeowners in the 2008 newsletter, the document was not signed by all homeowners and states that:

> Each Owner of a Dwelling or Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance for each Dwelling or Lot owned by such Owner, hereby covenants and agrees and shall be deemed to covenant and agree to pay to the Association such assessments as are levied pursuant to the provisions of this Declaration. Such assessments, together with interest thereon and cost of collection, if any, as hereinafter provided, shall be a charge and continuing lien upon the Dwelling or Lot against which such assessment is made. Each such assessment shall also be the personal obligation of the Owner who was the Owner of such Dwelling or Lot at the time when the same fell due. Such personal obligation shall pass to his successors in title and shall also constitute a lien on the land effected thereby until fully paid. [Article VI Section 1]

## DISCUSSION

The defendants have moved for summary judgment on all counts. Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. See CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported only by speculation or conjecture.'" Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

## LLPOA / KALMAN MOTION

Plaintiff has brought four state law property claims against these defendants: Trespass; Tortious Interference; Private Nuisance; and Slander of Title. Defendants first argue that these claims are barred by the applicable five year statute of limitations. 735 ILCS 5/13-205. In particular, defendants argue that plaintiff was aware of his claims as early as 2011 when he filed the state court action. The court rejected this argument when ruling on the motion to dismiss (see Doc. 93 at p. 5) and rejects it again for the same reasons. Specifically, plaintiff's property claims are premised on the recording in 2015 of the "Amended and Restated Declaration of Restrictions

7

and Easements for [LLOPA]." This amounts to a new violation which has occurred within the applicable limitations period.

Next, defendants argue that the undisputed facts show that the LLPOA is a "common interest community association" or mandatory HOA, either because of the express terms of the recorded declarations, or impliedly, giving it the power to impose assessments and enact and enforce the rules about which plaintiff complains. The court disagrees.

The original declarations contained express restrictions that ran with the land. None of those restrictions required maintenance of the lake or parks, or imposed any burdens on the land-owners. Importantly, the declarations provided that the restrictions could be extended, but did not provide for alteration or additions. The declarations also provided easements to the land-owners for use of the lake and parks and that title to the lake and parks could be transferred to any group or association of property owners organized for the purpose of acquiring such title, but that the conveyance would be subject to the easements and rights granted. Further, the declarations specifically state that the owner of the lake and parks, whether that owner is the original developer or the association organized to take title, is not required to maintain the lake or parks.

Plaintiff argues correctly that the LLPOA was organized as and remains a voluntary association because it was never agreed to by all of the property owners. It takes unanimous consent to create a mandatory association. Indeed, as plaintiffs note, Jordan Shifrin, a named partner in KSN explained in an IICLE article that "in order to create a homeowners' association, there must be unanimous subscription to an underlying document by the owners of the property -- . . .. Anything less creates a 'voluntary' association in which membership is not mandatory and rules are not enforceable against nonmembers." Illinois Condominium Law (2010), Illinois

8

Institute for Continuing Legal Education. See also Lakeland Property Owners Assoc. v. Larson, 121 Ill. App. 3d 805 (2nd Dist. 1984). In Lakeland, like the instant case, the property owner's association voted to amend the covenants to impose maintenance fees on the lot owners. The court concluded that the original declaration provided for a change in the covenants but did not allow the addition of covenants that were new and different from those in the lot owner's deed. "Where a deed contains restrictive covenants but also permits their future alteration, the language employed determines the extent and scope of that provision." Id. at 810. Analyzing the language used, the Lakeland court determined that the provision allowing amendment to the covenants referred to changes in the existing covenants, rather than the addition of new covenants that had no relation to the existing covenants. Id. The court then concluded that the imposition of a maintenance fee constituted a new covenant for which notice was not given, unrelated to those in existence at the time the lot owner purchased the property.

  In the instant case, unlike in Lakeland, the declarations do not provide for any alteration or amendment to the existing covenants. Nor do they provide for the creation of any new restrictions. As noted in Lakeland, had a covenant in the deed required membership in the association and the payment of dues, a court would be obligated to enforce it. Id. But there is no such covenant in the instant case because the developer failed to include one. Defendants argue that the 1986 recording of the Public Notice of Annual Assessment put plaintiff on notice of the fees when he purchased his property in 1991. But nothing in the original declarations gave the LLPOA the right to add covenants or assess fees. Thus, its recordation of the notice was improper. So too was the 2015 recording of the Amended and Restated Declaration of

9

Restrictions and Easements for [LLOPA] improper, because the LLPOA had no authority to alter existing covenants or create new ones.

Defendants also argue that the court should regard the LLPOA to be a common interest community association by implication, citing the Restatement (Third) of Property § 6.2 (2000). That sections provides that there may be an implied obligation to contribute to the maintenance of commonly held property without regard to usage. The section does not apply, however, because the original declarations did not expressly call for the creation of an association that would hold title; they simply provided that title could pass to such an association. And while the declarations allowed the owner of the lake and parks to impose reasonable restrictions on their use, as noted above, nothing in those declarations allowed for the creation of new covenants. Nothing indicates that it was the intention of the developer to allow 2/3 of the lot owners to impose dues on individual lot owners at some time in the future. Lakeland, 121 Ill. App. 3d at 812-13.

Finally, defendants argue that each claim has individual deficiencies. For example, defendants argue that the tortious interference with easement claim fails because it is unclear that Illinois law provides for such a claim. Not true. See Metropolitan Water Reclamation Dist. Of Greater Chicago v. Terra Foundation for American Art, 2014 IL App (1st) 130307 at ¶61 (Historically, tort damages have been allowed for interferences with easements.).

Defendants challenge plaintiff's nuisance claim, which requires that the act complained of "invade another's interest in the use and enjoyment of his land." Woods v. Kahn, 95 Ill. App. 3d 1087 (5th Dist. 1981). The invasion must be substantial and either intentional or negligent and unreasonable. Id. at 1090. Certainly, preventing plaintiff's use of the lake and park meets this definition.

Defendants also challenge plaintiff's slander of title claim, arguing that plaintiff cannot demonstrate special damages as a result of the 2015 recording because he has not paid any fees and has not attempted to sell his home. A plaintiff bringing a claim for slander of title must specifically allege special damages, meaning pecuniary losses resulting from the slander. Diminution in value as well as attorney's fees and costs reasonably necessary to remove the doubt cast upon vendibility or value are considered recoverable special damages. Plaintiff can undoubtedly establish the attorney's fees and costs necessary to get the improper recordings removed. Consequently, the court denies LLPOA and Kalman's motion for summary judgment.[2]

**KSN MOTION**

In count VI plaintiff alleges that KSN violated the FDCPA by sending him a collection letter in 2016 on behalf of the LLPOA because the LLPOA lacked authority to assess the fees. KSN argues that it did not violate the FDCPA because the LLPOA acted properly.

This argument fails because the court has determined above that the LLPOA had no authority to add new covenants. KSN's reliance on Zito v. Gerken, 225 Ill. App. 3d 79 (1st Dist. 1992), to distinguish Lakeland, is misplaced. In Zito, the developer incorporated the association to serve as the regulating and controlling body of the subdivision and empowered it to act for the benefit of the homeowners, and to have all such powers necessary to effectuate the desires of its membership. The developer recorded two restrictive covenants establishing a comprehensive scheme of regulation of the subdivision. Both restrictive covenants permitted the developer to amend them at any time.

---

2 Plaintiffs have offered the expert report of Jeffrey Rothbart to support their claim of special damages. Defendants have moved [Doc. 221]to strike that report as consisting merely of legal conclusions. The court agrees and strikes the report without prejudice to plaintiffs offering evidence of special damages at trial.

In the instant case, unlike in Zito, the LLPOA was not incorporated by the developer when it owned all the lots. And the original declarations did not provide for either amending the covenants or creating new ones. Consequently, Zito is inapposite, and the court denies KSN's motion for summary judgment.

## CONCLUSION

For the reasons described above Kalman's and LLPOA's motion for summary judgment [Doc. 194] and KSN's motion for summary judgment [Doc. 191] are denied. Defendants' motion to strike [Doc. 221] is granted without prejudice.

ENTER:

_____
Robert W. Gettleman
United States District Judge

**DATE:   November 12, 2012**