IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| J.G. WAHLERT on behalf of himself and all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>KOVITZ SHIFRIN NESBIT, a professional corporation, KALMAN MANAGEMENT, INC., and LOCH LOMOND PROPERTY OWNERS ASSOCIATION, )<br>)<br>Defendants. ) | Case No.  17 C 8055<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiff J.G. Wahlert, on behalf of himself and all others similarly situated, brought a six count amended putative class action complaint against defendants Kovitz, Shifrin, Nesbit ("KSN"), Kalman Management, Inc. ("Kalman"), and the Loch Lomond Property Owners Association, ("LLPOA"). Count I asserts a violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1 et seq. against all three defendants. Counts II and III, also brought against all three defendants, allege claims for "tortious interference" and private nuisance. Count IV is brought against LLPOA and KSN for slander of title. Count V alleges trespass to easement against Kalman and LLPO. Count VI is brought solely against KSN for violation of the Fair Debt Collection Practices Act ("FDCPA"). Kalman answered the amended complaint, while KSN and LLPOA moved to dismiss the counts brought against them. On February 7, 2019, the court dismissed counts I-IV as to KSN, leaving only count VI (for violating the FDCPA) against KSN.[1] The court also granted LLPOA's motion as

---

[1] The court held that count I failed to state a claim because plaintiff's claims do not involve trade or commerce or a real estate transaction, and do not satisfy the "consumer nexus test." [Doc. 93 at 8-9]. The court dismissed count I

to count I only, leaving counts II-V against it [Doc. 93]. KSN then moved for summary judgment on count VI, and Kalman and LLPOA moved for summary judgment on counts II-V. The court denied both motions. After lengthy settlement discussions proved fruitless, plaintiff has now moved to certify two separate classes:

> "Perpetual Easement Owner Class" consisting of all persons that owned any of the approximately 450 Loch Lemond Lots (from the original three subdivisions) that are not lake-front lots, at any time from the five years prior to the filing of this act through the date of class certification; except: (a) current or former LLPOA officials; (b) real estate sales agents owning or operating out [of] any Century 21 franchise located at 700 N. Lake St. in Mundelein; and (c) Village of Mundelein officials.
>
> "FDCPA Class" consisting of all persons that were sent, according to Defendants' records, a debt-collection letter from Defendant KSN in substantially the form as <u>Exhibit 1</u> hereto (the November 7, 2016 collection letter).

KSN does not object to certification of the FDCPA class under Fed. R. Civ. P. 23(b)(3). Kalman and the LLPOA defendants ("defendants") object to certification of the Perpetual Easement Owner Class. For the reasons that follow, plaintiff's motion for certification is granted as to both classes.

## BACKGROUND

In the 1950s, Arthur T. McIntosh & Co. developed property in Mundelein, Illinois, for the purpose of selling homes around a man-made lake it called Loch Lomond Lake and two parks. The company recorded three documents entitled "Declaration of Restrictions and

---

in its entirety, including the claim against Kalman. The FDCPA claim against KSN constitutes the basis for federal jurisdiction in this case.

2

Easements" in 1954, 1955, and 1956. Each of those recorded documents listed restrictions on each lot in the subdivision that were to be construed as covenants that ran with the land until 1980, at which time "any and all such restrictions may be extended to continue in effect beyond January 1, 1980, by the owner or owners of two-thirds (2/3) in number of said lots in the subdivision . . . ." Those restrictions basically dealt with the types of buildings that could be built on the land.

The three recorded documents also listed rights and easements granted to owners of the lots. The documents granted lot owners a perpetual easement "in, upon, and across the Lake and Parks," subject to "reasonable regulations by the owner or owners from time to time of said Lake or Parks." The documents also provided that "neither the grant of such easements . . ., nor the use of said Lake [or Parks] by the grantees of such easements, nor anything in this instrument or in any recorded plat of subdivision contained, shall be construed to impose upon the undersigned or its successors or assigns, or the owner or owners from time to time of said Lake [or Parks], any duty to maintain said Lake [or Parks] in its present, or any other, size depth, or condition."

Finally, all three recorded documents granted the developer or its successors or assigns the "right to convey the Lake [or Parks] or any part or parts thereof, to any association or group of property owners organized for the purpose of acquiring and holding title to the Lake [or Parks]. Any such conveyance shall be made subject to the easements and rights declared, granted and reserved in this instrument."

In 1957, the LLPOA was chartered and incorporated by ten of 561 lot owners. As listed in the Articles of Incorporation, its purpose was "to promote the civic, education, patriotic,

economic, social and charitable purposes of the community known as Loch Lomond, to bring together the members of said community to the end that the strength of their common efforts and unity will result in greater benefit to all."

Four years later, in 1961, McIntosh Co. transferred title to the lake and parks to the LLPOA, subject to the same rights and easements in the original declarations. There were no changes to those rights and easements, no mention of Home Owner Association ("HOA") fees, assessments, or new restrictions or regulations. McIntosh retained the right to take back title if the LLPOA authorized or permitted use of the premises or any part by any person other than the owners and occupants of the lots and parcels of real estate described in the declarations. From 1963 through 1979, the LLPOA filed annual reports with the Illinois Secretary of State without claiming that it was an HOA or that it was maintaining the lake or parks.

In 1980 the LLPOA recorded an "Agreement to Extend the Declaration of Restrictions and Easements" (the "1980 Extension"). This agreement was signed by 2/3 of the property owners, and extended the original restrictions and easements contained in the original declarations, subject to the same conditions. The agreement repeated the same language in the original declarations indicating that the owners of the lake and parks were under no duty to maintain them. The agreement was not signed by all property owners and contained no language purporting to add any additional restrictions on the use of the lake or parks. Specifically, the agreement contained nothing about HOA fees or assessments.

Nonetheless, sometime after the 1980 recording, the LLPOA began to attempt to collect assessments from the property owners. It also created a welcome letter sent to new owners, indicating that the title to the lake belongs to the LLPOA "with conditions which were set up by

4

the Arthur T. McIntosh Company when this subdivision was developed. A principal condition was that title would continue to belong to the Association so long as the lake is properly maintained. . . . . To satisfy this requirement, the LLPOA has voted into effect rules covering the use of the lake and beaches over the years," one of which is that "[a]ll residents are required to pay dues or a lien may be placed against your property and the outstanding balance shall bear interest." These same representations were posted on the LLPOA website. As noted above, however, no such condition to maintain the lake was ever placed on the LLPOA. In fact, the declarations specifically indicated that the owner had no duty to maintain the lake.

In 1986 the LLPOA recorded a document titled "Loch Lemond Property Owners Association Public Notice of Annual Assessment." This document indicated that the current by-laws of the LLPOA provided that "Beginning with the 1983 assessment, when property is sold by a property owner not in good standing because of non-payment of assessment, the payment of the 1983 assessment and subsequent assessments as they become due shall be a condition to access to and use of the Association's real property and appurtenances thereto by the new owner." By the recording, the LLPOA purported to give notice that it owned the lake, beach and park areas and that "access to, use of and enjoyment of said lake, parks and beaches, is restricted only to those whose assessments are currently paid, and therefore are members in good standing of the [LLPOA]."

Plaintiff purchased his property in the Lake Lomond subdivision in 1991. At the time he purchased the property he was told by someone purporting to be an official of the LLPOA that all property owners were automatically members of the LLPOA and had to pay $220 in annual dues because the LLPOA was maintaining the lake. The deed to his home provides that he

5

purchased his property "subject to . . . covenants and conditions of record." At that time the original declarations, the 1980 Extension, and the 1986 Notice of Public Assessment had all been recorded.

By 2008, plaintiff had paid approximately $4600 in assessments from 1981 to 2008, and had access to and use of the lake and parks. Starting in 2008 plaintiff stopped paying assessments, believing that there had been a fraud by the LLPOA because it had no right to collect assessments. In a November 2008 newsletter, based on advice from KSN, the LLPOA told owners that: a) "we cannot collect back dues in a collection notice fashion"; b) the LLPOA cannot put a lien on property for not paying back dues; and c) "we would probably lose if we took a resident to court to collect back dues. We can not change the covenant without every person in the Association Agreeing to it."

On January 12, 2001, the LLPOA recorded a document entitled "Bylaws of Loch Lomond Property Owners Association." These bylaws indicate that the LLPOA's chartered purpose was to "administer and enforce" any "covenants, restrictions, easements, charges, and liens," and to "maintain the Lake." As noted above, this was not part of its original chartered purpose, and there was, at that time, no recorded document providing that the LLPOA had any right or duty to enforce the covenants.

In 2011, plaintiff sued the LLPOA in the Circuit Court of Lake County, Illinois, seeking a declaration that the LLPOA is a voluntary membership association and is not empowered to assess dues against plaintiff or obstruct plaintiff's exercise of his easement rights or threaten to or file liens against plaintiff's property for failure to pay dues. That case was ultimately voluntarily dismissed.

Finally, in 2015, the LLPOA recorded a document prepared by KSN and titled "Amended and Restated Declaration of Restrictions and Easements for Loch Lomond Property Owners Association" (the "Amended Declaration"). This document, which forms the basis of plaintiff's present claims, adds new covenants and purports to declare that every owner of a dwelling or lot to be a member of the LLPOA, that the provisions are mandatory, and that and that no owner shall have the right or power to disclaim, terminate or withdraw from membership in the LLPOA or any of his obligations as such member. Contrary the notice sent to homeowners in the 2008 newsletter, the document was not signed by all homeowners and states that:

> Each Owner of a Dwelling or Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance for each Dwelling or Lot owned by such Owner, hereby covenants and agrees and shall be deemed to covenant and agree to pay to the Association such assessments as are levied pursuant to the provisions of this Declaration. Such assessments, together with interest thereon and cost of collection, if any, as hereinafter provided, shall be a charge and continuing lien upon the Dwelling or Lot against which such assessment is made. Each such assessment shall also be the personal obligation of the Owner who was the Owner of such Dwelling or Lot at the time when the same fell due. Such personal obligation shall pass to his successors in title and shall also constitute a lien on the land effected thereby until fully paid. [Article VI Section 1]

## DISCUSSION

Class action suits are governed by Fed. R. Civ. P. 23. A two-step analysis is required to determine if class certification is appropriate. First, plaintiff must satisfy all four requirements of Rule 23(a): 1) numerosity; 2) commonality; 3) typicality; and 4) adequacy of representation. Harper v. Sheriff of Cook County, 581 F.3d 511, 513 (7th Cir. 2009). Second, the action must

7

also satisfy one of the conditions of Rule 23(b).  Id.  In the instant case, plaintiff seeks damages and certification of the Perpetual Easement Owner Class under Rule 23(b)(3), which requires that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Rule 23(b)(3) class actions are designed to "cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Amchem Prods, Inc. v Windsor, 521 U.S. 591, 615.

In addition to damages, plaintiff seeks injunctive relief, and asserts that class certification is appropriate under Rule 23(b)(2), which states that a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendants argue that plaintiff cannot satisfy the typicality and adequacy requirements of Rule 23(a)(3) and (4), and that even if he could, he cannot satisfy the requirements of Rule 23(b)(2 or (3).  The court addresses each argument in turn.

At the heart of plaintiff's claims in this case is the Amended Declaration, by which the LLPOA attempted to add new covenants, declare every owner of a dwelling or lot to be a member of the association, provide that the provisions of the declaration were mandatory, and that no owner had the right or power to disclaim, terminate or withdraw from the association. The court has already ruled that the Amended Declaration was invalid because it was not signed

8

by all lot owners.  Wahlert v. Kovitz, Shrifin Nesbit, 2021 WL 5280942 (N.D. Ill. Nov. 12, 2021).

Defendants first argue that because plaintiff did not vote on the Amended Declaration and that the majority of the putative class voted in favor of the document, there is an "intra-class conflict that renders plaintiff inadequate and atypical to represent the class."  Relying on Riffy v. Rauner, 873 F.3d 558, 564 (7th Cir. 2017), vacated on other grounds, 138 S. Ct. 2708 (2018), defendants argue that "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims."  According to defendants, 286 of 450 lot owners with non-lakefront lots voted in favor of the amendment.  Defendants argue that plaintiff cannot fairly represent the interests of hundreds of lot owners who disagreed with his position.

Plaintiff first counters that the owners who voted in favor of the amendment were not fully informed, that their votes were procured under false pretenses, there is a legitimate dispute as to the validity of the election and, most importantly, those votes were cast over a decade ago, prior to this court's ruling that the Amended Declaration was invalid.  Plaintiff also disputes Riffy's application to the instant case.  In Riffy, the district court denied class certification to health care assistants who wanted to certify a class for purposes of securing a class-wide refund of the "fair-share" fees they paid to a union for collective bargaining representation.  The district court concluded that there were serious intra-class conflicts of interests because 65% of the potential class members had since voted to join the union.  The court noted that "a class representative who wants to undermine the union is not likely to be a suitable representative for a group that includes people who have no such hostility."  Riffy v. Rauner, 2016 WL 3165715 at * 7 (N.D. Ill. June 7, 2016).  The Seventh Circuit initially affirmed, but on remand from the

9

Supreme Court affirmed on predominance grounds, not on adequacy of representation grounds. Riffy, 910 F.3d 314 (7th Cir. 2019). Thus, plaintiff argues that the original Seventh Circuit Riffy opinion lends no support to defendants. Plaintiff also points out that the Riffy court was influenced by the fact that the plaintiffs refused to attempt to revise the class definition despite being given the opportunity to do so. Here, plaintiff agrees to a revised class of those owners who voted against the amendment.

The mere possibility that not every member of the proposed class was injured does not necessarily preclude certification. "[A] class will often include persons who have not been injured by the defendant's conduct…. Such a possibility or indeed inevitability does not preclude class certification." Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009). "How many (if any) of the class members have a valid claim is the issue to be determined after the class is certified." Messner v. Northshore Univ. Healthsys., 669 F.3d 802, 823 (7th Cir. 2012). If, however, "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." Id. at 824.

There is a difference, however, "between class members who were not harmed and those who could not have been harmed." Id. at 825. In the instant case, just because some owners may have voted in favor of the Amended Declaration does not necessarily mean they could not have been harmed by its invalidity and recording. For example, many owners may have been paying the allegedly improper dues believing they were required to do so when in fact they could have decided to change their minds and not pay. In fact, there is no evidence that the owners who voted in favor of the Amended Declaration would have continued to pay if they knew it was

not required. Additionally, an improper recording of the Amended Declaration may well create a cloud on every lot owner's title. Consequently, the court rejects defendants' argument that plaintiff cannot adequately represent the class because of an intra-class conflict. In this regard, the court also rejects defendants' argument that class members who voted yes to the Amended Declaration are subject to a unique defense rendering plaintiff's claim atypical.

The court also rejects defendants' argument that plaintiff is an inadequate representative because of his personal animus against defendants. Although plaintiff has had many disputes with defendants, most, if not all, have all been fueled by his efforts to prove that defendants have no right to prevent his (as well as other's) access to the lake. There is nothing to indicate that the instant suit is "fueled by the spite or hostility of an unduly antagonistic litigant or by some other ulterior motive or irrational purpose unrelated to the claims alleged in the complaint." Kamean v. Loc. 363, Int's Bhd. Of Teamsters, Chauffers, Warehousemen & Helpers of Am., 109 F.R.D. 391, 395 (S.D.N.Y. 1986). Consequently, the court concludes that plaintiff has satisfied the requirements of Rule 23(a).

Defendants next challenge plaintiff's ability to satisfy Rule 23(b). As noted, because plaintiff seeks damages, he argues that the class definition satisfies Rule 23(B)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(B)(3). Specifically, plaintiff argues that the recording of the Amended Declaration slanders the class members' title to their property causing each member "special damages." To establish these special damages, plaintiff relies on the expert report of Jeffrey Rothbart, who opined on a method to calculate damages based on "abatement of the value of Plaintiff's and class members' residences based on the improper

assessment." Using Rothbart's opinion, plaintiff argues that the damages can be measured on a class-wide basis, satisfying the Rule's predominance requirement.

As defendants argue, however, the court has already struck Rothbart's report as consisting merely of legal opinions. Thus, plaintiff cannot rely on the report to support his motion for class certification. Nonetheless, plaintiff correctly argues that the evidence needed to establish a prima facie case for each individual member would be the same. That evidence, according to plaintiff, consists largely of the documents described above. The common question of law to be decided is whether interpretation of those documents establishes plaintiff's claims.

Moreover, even if damages may have to be tried separately, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defense peculiar to some individual class members." Hicks v. State Farm Fire & Cas. Co., 965 F.3d 452, 460 (6th Cir. 2020) (internal quotations omitted). The predominance requirement is satisfied when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication. Messner, 669 F.3d at 815. Put another way, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." Id. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." Id. Individual questions need not be absent, they just cannot predominate over the common questions affecting the class as a whole. Id.

The court agrees with plaintiff that a significant aspect of the case is whether defendants improperly recorded the invalid Amended Declaration, thereby slandering the individual class members' titles. Consequently, the court concludes that plaintiff has satisfied the predominance requirement of Rule 23(b)(3), and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CONCLUSION

For the reasons described above, plaintiff's motion for class certification [261] is granted. The FDCPA class is certified and defined as "consisting of all persons that were sent, according to Defendants' records, a debt-collection letter from Defendant KSN in substantially the form as Exhibit 1 hereto (the November 7, 2016 collection letter)."

The court has questions concerning the definition of the Perpetual Easement Owner Class proposed by plaintiff. This matter is set for an in person hearing on September 6, 2023, at 10:45 a.m. to discuss the class definition and other issues concerning class certification.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

**DATE:    August 21, 2023**