IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J.G. WAHLERT, Plaintiff, | ) | Case No. 17 C 8055 |
| v. | ) | Judge Robert W. Gettleman |
| KOVITZ SHIFRIN NESBIT, a professional corporation; KALMAN MANAGEMENT, INC., and LOCH LOMOND PROPERTY OWNERS ASSOCIATION, Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff J.G. Wahlert is a homeowner in the Loch Lomond Community near Mundelein, Illinois. At the center of Loch Lomond lies Loch Lomond Lake. Plaintiff, on behalf of himself and all others similarly situated, filed a six-count amended putative class action complaint against defendants Kovitz, Shifrin, Nesbit ("KSN"), Kalman Management, Inc. ("Kalman"), and the Loch Lomond Property Owners Association ("LLPOA"), seeking redress for, among other things, the LLPOA's alleged violation of plaintiff's and the class's easement rights to access Loch Lomond Lake. Following motion practice and unsuccessful settlement discussions, the court granted plaintiff's motion to certify two separate classes—a Perpetual Easement Owner Class and a Fair Debt Collection Practices Act ("FDCPA") Class (the "FDCPA Class"). In doing so, the court formally certified the FDCPA Class. But because the court had questions about the proposed definition of the Perpetual Easement Owner Class, the court did not certify it, and instead directed the parties to submit a revised definition for it.

Plaintiff thereafter proposed a new definition. But before it was adopted, the parties reported that they had reached a settlement in principle. The court then preliminarily approved a settlement agreement with a settlement class that was broader than the proposed Perpetual Easement Owner Class. But certain settlement-class members objected, and the parties and objectors were ultimately unable to reach an agreement to settle the objections.

LLPOA and Kalman (collectively, "defendants") thereafter moved to decertify the Perpetual Easement Owner Class. But because the court had never formally certified that class, the court denied the motion as moot. The parties then engaged in further settlement discussions, but no settlement was reached.

Plaintiff now renews its motion to certify what he calls the "Easement Enforcement Class"—a "narrow, unified subclass of property owners who share identical injuries and legal interests." Defendants oppose the motion. For the reasons below, the court grants the motion.

## BACKGROUND

### Factual Background

In the 1950s, Arthur T. McIntosh & Co. developed property in Mundelein, Illinois, for the purpose of selling homes around man-made Loch Lomond Lake and two parks. The company recorded three documents entitled "Declaration of Restrictions and Easements" in 1954, 1955, and 1956. Each of those recorded documents listed restrictions on each lot in the subdivision that were to be construed as covenants that ran with the land until 1980, at which time "any and all such restrictions may be extended to continue in effect beyond January 1, 1980, by the owner or owners of two-thirds (2/3) in number of said lots in the subdivision . . . ." Those restrictions basically dealt with the types of buildings that could be built on the land.

The three recorded documents also listed rights and easements granted to owners of the lots. The documents granted lot owners a perpetual easement "in, upon, and across the Lake and Parks," subject to "reasonable regulations by the owner or owners from time to time of said Lake or Parks." The documents also provided that "neither the grant of such easements . . ., nor the use of said Lake [or Parks] by the grantees of such easements, nor anything in this instrument or in any recorded plat of subdivision contained, shall be construed to impose upon the undersigned or its successors or assigns, or the owner or owners from time to time of said Lake [or Parks], any duty to maintain said Lake [or Parks] in its present, or any other, size depth, or condition."

Finally, all three recorded documents granted the developer or its successors or assigns the "right to convey the Lake [or Parks] or any part or parts thereof, to any association or group of property owners organized for the purpose of acquiring and holding title to the Lake [or Parks]. Any such conveyance shall be made subject to the easements and rights declared, granted and reserved in this instrument."

In 1957, the LLPOA was chartered and incorporated by ten of 561 lot owners. As listed in the Articles of Incorporation, its purpose was "to promote the civic, education, patriotic, economic, social and charitable purposes of the community known as Loch Lomond, to bring together the members of said community to the end that the strength of their common efforts and unity will result in greater benefit to all."

Four years later, in 1961, McIntosh Co. transferred title to the lake and parks to the LLPOA, subject to the same rights and easements in the original declarations. There were no changes to those rights and easements, no mention of Home Owner Association ("HOA") fees,

assessments, or new restrictions or regulations. McIntosh retained the right to take back title if the LLPOA authorized or permitted use of the premises or any part by any person other than the owners and occupants of the lots and parcels of real estate described in the declarations. From 1963 through 1979, the LLPOA filed annual reports with the Illinois Secretary of State without claiming that it was an HOA or that it was maintaining the lake or parks.

In 1980, the LLPOA recorded an "Agreement to Extend the Declaration of Restrictions and Easements" (the "1980 Extension"). This agreement was signed by 2/3 of the property owners, and extended the original restrictions and easements contained in the original declarations, subject to the same conditions. The agreement repeated the same language in the original declarations indicating that the owners of the lake and parks were under no duty to maintain them. The agreement was not signed by all property owners and contained no language purporting to add any additional restrictions on the use of the lake or parks. Specifically, the agreement contained nothing about HOA fees or assessments.

Nonetheless, sometime after the 1980 Extension, the LLPOA began to attempt to collect assessments from the property owners. It also created a welcome letter sent to new owners, indicating that the title to the lake belongs to the LLPOA "with conditions which were set up by the Arthur T. McIntosh Company when this subdivision was developed. A principal condition was that title would continue to belong to the Association so long as the lake is properly maintained. . . . To satisfy this requirement, the LLPOA has voted into effect rules covering the use of the lake and beaches over the years," one of which is that "[a]ll residents are required to pay dues or a lien may be placed against your property and the outstanding balance shall bear interest." These same representations were posted on the LLPOA website. As noted above,

however, no such condition to maintain the lake was ever placed on the LLPOA. In fact, the declarations specifically indicated that the owner had no duty to maintain the lake.

In 1986 the LLPOA recorded a document titled "Loch Lemond Property Owners Association Public Notice of Annual Assessment." This document indicated that the current by-laws of the LLPOA provided that, "Beginning with the 1983 assessment, when property is sold by a property owner not in good standing because of non-payment of assessment, the payment of the 1983 assessment and subsequent assessments as they become due shall be a condition to access to and use of the Association's real property and appurtenances thereto by the new owner." By the recording, the LLPOA purported to give notice that it owned the lake, beach and park areas and that "access to, use of and enjoyment of said lake, parks and beaches, is restricted only to those whose assessments are currently paid, and therefore are members in good standing of the [LLPOA]."

Plaintiff purchased his property in the Lake Lomond subdivision in 1991. At the time he purchased the property he was told by someone purporting to be an official of the LLPOA that all property owners were automatically members of the LLPOA and had to pay $220 in annual dues because the LLPOA was maintaining the lake. The deed to his home provides that he purchased his property "subject to . . . covenants and conditions of record." At that time the original declarations, the 1980 Extension, and the 1986 Notice of Public Assessment had all been recorded.

By 2008, plaintiff had paid approximately $4600 in assessments from 1981 to 2008, and had access to and use of the lake and parks. Starting in 2008 plaintiff stopped paying assessments, believing that there had been a fraud by the LLPOA because it had no right to

collect assessments. In a November 2008 newsletter, based on advice from KSN, the LLPOA told owners that: a) "we cannot collect back dues in a collection notice fashion"; b) the LLPOA cannot put a lien on property for not paying back dues; and c) "we would probably lose if we took a resident to court to collect back dues. We can not change the covenant without every person in the Association Agreeing to it."

On January 12, 2011, the LLPOA recorded a document entitled "Bylaws of Loch Lomond Property Owners Association." These bylaws provide that the LLPOA's chartered purpose was to "administer and enforce" any "covenants, restrictions, easements, charges, and liens," and to "maintain the Lake." As noted above, this was not part of its original chartered purpose, and there was, at that time, no recorded document providing that the LLPOA had any right or duty to enforce the covenants.

In 2011, plaintiff sued the LLPOA in the Circuit Court of Lake County, Illinois, seeking a declaration that the LLPOA is a voluntary membership association and is not empowered to assess dues against plaintiff or obstruct plaintiff's exercise of his easement rights or threaten to or file liens against plaintiff's property for failure to pay dues. That case was ultimately voluntarily dismissed.

Finally, in 2015, the LLPOA recorded a document prepared by KSN and titled "Amended and Restated Declaration of Restrictions and Easements for Loch Lomond Property Owners Association" (the "Amended Declaration"). This document, which forms the basis of plaintiff's present claims, adds new covenants and purports to declare that every owner of a dwelling or lot to be a member of the LLPOA, that the provisions are mandatory, and that no owner shall have the right or power to disclaim, terminate or withdraw from membership in the

LLPOA or any of his obligations as such member. Contrary to the notice sent to homeowners in the 2008 newsletter, the document was not signed by all homeowners and states that:

> Each Owner of a Dwelling or Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in any such deed or other conveyance for each Dwelling or Lot owned by such Owner, hereby covenants and agrees and shall be deemed to covenant and agree to pay to the Association such assessments as are levied pursuant to the provisions of this Declaration. Such assessments, together with interest thereon and cost of collection, if any, as hereinafter provided, shall be a charge and continuing lien upon the Dwelling or Lot against which such assessment is made. Each such assessment shall also be the personal obligation of the Owner who was the Owner of such Dwelling or Lot at the time when the same fell due. Such personal obligation shall pass to his successors in title and shall also constitute a lien on the land effected thereby until fully paid. [Article VI Section 1]

## Procedural Background

In 2017, plaintiff, on behalf of himself and all others similarly situated, filed a putative class action against KSN, Kalman, and the LLPOA. Plaintiff thereafter filed an amended complaint, in which he asserts: a claim against all three defendants for a violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 et seq., (Count I); a claim against all three defendants for tortious interference (Count II) and for private nuisance (Count III) based on defendants' tortiously interfering and substantially invading plaintiff's and the class members' easement rights by blocking access to the easement, recording false documents, and unlawfully seeking to collect unauthorized dues; a claim for slander of title against LLPOA and KSN (Count IV) based on the recording of the Amended Declaration; a claim for trespass to easement against Kalman and LLPOA (Count V) based on their blocking plaintiff's and class

members' access with gates that block access to the parks and the lake; and a claim against KSN under the FDCPA (Count VI).

Kalman answered the amended complaint. KSN and LLPOA moved to dismiss the counts brought against them. The court dismissed Counts I-IV as to KSN, leaving only Count VI (the FDCPA count) against KSN. The court also granted LLPOA's motion as to Count I only, leaving Counts II-V against it (the court dismissed count I in its entirety, including the claim against Kalman). KSN then moved for summary judgment on Count VI, and Kalman and LLPOA moved for summary judgment on Counts II-V. This court denied both motions. See Wahlert v. Kovitz Shifrin Nesbit, No. 17 C 8055, 2021 WL 5280942, at *1 (N.D. Ill. Nov. 12, 2021).

After settlement discussions failed, plaintiff moved to certify two separate classes:

> "Perpetual Easement Owner Class" consisting of all persons that owned any of the approximately 450 Loch Lemond Lots (from the original three subdivisions) that are not lake-front lots, at any time from the five years prior to the filing of this act through the date of class certification; except: (a) current or former LLPOA officials; (b) real estate sales agents owning or operating out [of] any Century 21 franchise located at 700 N. Lake St. in Mundelein; and (c) Village of Mundelein officials.
>
> "FDCPA Class" consisting of all persons that were sent, according to Defendants' records, a debt-collection letter from Defendant KSN in substantially the form as Exhibit 1 hereto (the November 7, 2016 collection letter).

KSN did not object to certification of the FDCPA class under Fed. R. Civ. P. 23(b)(3). Kalman and LLPOA objected to certification of the Perpetual Easement Owner Class. On August 21, 2023, the court granted plaintiff's motion for certification for both classes. See Wahlert v. Kovitz Shifrin Nesbit, No. 17 C 8055, 2023 WL 5348757, at *6 (N.D. Ill. Aug. 21, 2023).

In doing so, the court explained that "[a]t the heart of plaintiff's claims in this case is the Amended Declaration, by which the LLPOA attempted to add new covenants, declare every owner of a dwelling or lot to be a member of the association, provide that the provisions of the declaration were mandatory, and that no owner had the right or power to disclaim, terminate or withdraw from the association." Id. at *4. The court also noted that it had "already ruled [on summary judgment] that the Amended Declaration was invalid because it was not signed by all lot owners." Id. (citing Wahlert, 2021 WL 5280942).

The court then addressed defendants' arguments against certification. As for the defendants' assertion that there was an intra-class conflict that rendered plaintiff inadequate and atypical because the majority of the proposed class voted in favor of the Amended Declaration, the court disagreed. Id. The court explained that "just because some owners may have voted in favor of the Amended Declaration does not necessarily mean they could not have been harmed by its invalidity and recording." Id. at *5. The court noted, for example, that "many owners may have been paying the allegedly improper dues believing they were required to do so," that there was "no evidence that the owners who voted in favor of the Amended Declaration would have continued to pay if they knew it was not required," and that "an improper recording of the Amended Declaration may well create a cloud on every lot owner's title." Id. The court thus rejected defendants' argument that because many of the proposed class voted in favor of the Amended Declaration, plaintiff could not adequately represent the class and his claim was atypical. Id.

The court next rejected defendants' argument that plaintiff was an inadequate representative because he allegedly held personal animus against defendants. The court

explained that, "[a]lthough plaintiff has had many disputes with defendants, most, if not all, have all been fueled by his efforts to prove that defendants have no right to prevent his (as well as other's) access to the lake." Id. There was "nothing to indicate," the court continued, that the case was "'fueled by the spite or hostility of an unduly antagonistic litigant or by some other ulterior motive or irrational purpose unrelated to the claims alleged in the complaint.'" Id. (citation omitted).

Finally, the court rejected defendants' contention that plaintiff could not satisfy Rule 23(b)(3)'s requirement "that questions of law or fact common to class members predominate over any questions affecting only individual members." Id. (quoting Fed. R. Civ. P. 23(b)(3)). The court found that there was predominance because "a significant aspect of the case is whether defendants improperly recorded the invalid Amended Declaration, thereby slandering the individual class members' titles." Id. at *6.

Having dispensed with the defendants' various arguments against certification, the court granted plaintiff's motion to certify the two classes. Id. But because the court had questions about plaintiff's proposed definition of the Perpetual Easement Owner Class, id., it held a hearing to discuss that definition, which resulted in the court directing the parties to submit a revised class definition.

Plaintiff thereafter proposed the following revised definition for the Perpetual Easement Owner Class:

> "Perpetual Easement Owner Class" consisting of all persons that owned any of the approximately 450 Loch Lomond Lots (from the three subdivisions and which are identified in the 1961 trust instrument and conditional deed conveyed to the LLPOA, attached as Exhibit 7 to the amended complaint) that are not lake-front lots, at any time from the October 22, 2015 through the date of class certification; except: Stephen Kovac, and certain LLPOA directors identified as follows: James

> Carroll, Brennan Casey, Kevin May, Linda Klink, Thomas Klink, John Gavin, Denise Gavin, Lawrence Goodwin, Sasha Sattler, Donna Sattler, Luke Emde, Barbara Emde, Mickey Emde, Anthony Baade, Megan Boedecker, Angela Trillhaase, Deborah Rusin, Nancy Burton, and Dan Lennon.

But before the revised definition was adopted, the parties reported that they had a settlement in principle. The court thereafter issued a preliminary approval order that preliminarily approved as fair, reasonable, and adequate the terms of a settlement agreement. In that order, the court conditionally certified the following settlement class:

> a. All current and former lot owners that are or were subject to the 2015 Amended and Restated Declaration of Restrictions and Easements.
>
> b. Excluded from the Settlement Class are Stephen Kovac, Patricia Kovac, and certain LLPOA directors and their spouses, identified as follows: James Carroll, Brennan Casey, Kevin May, Linda Klink, Thomas Klink, John Gavin, Denise Gavin, Lawrence Goodwin, Sasha Sattler, Donna Sattler, Luke Emde, Barbara Emde, Anthony Baade, Megan Boedecker, Angela Trillhaase, Deborah Rusin, Nancy Burton, and Dan Lennon.

The settlement class was thus broader than the proposed Perpetual Easement Owner Class, which did not include lakefront-facing owners and owners in three smaller subdivisions within the Loch Lomond community.

Certain members of this broader settlement class—who defendants contended were owners of 237 separate lots out of the 602 lots that comprise the Loch Lomond subdivision—then filed a notice of objection to the settlement agreement. Defendants asserted that of the 237 separate lots, 89 were also part of the proposed Perpetual Easement Owner Class—translating to roughly 21% of that proposed class. According to the objectors, they "earnestly believe[d]" that the proposed settlement agreement was "inconsistent with the law, association documents, and long-held practices required to keep the lake safe for recreational use, but more importantly to

meet [their] duty to the surrounding community, including [their] placement in the Bull Creek Water Shed."

In light of the objections, the magistrate judge held a settlement conference with counsel for plaintiff and the LLPOA, and with more than 100 objectors. The parties and objectors failed to reach an agreement to settle the objections.

Defendants thereafter moved to decertify the Perpetual Easement Owner Class. But because the court had never formally certified that class, it denied the motion as moot. The parties then engaged in further settlement discussions off the record, which proved unsuccessful.

Plaintiff now renews its motion to certify a class, proposing an Easement Enforcement Class, which he argues is narrower than the previously proposed Perpetual Easement Owner Class.

## DISCUSSION

### Class Actions under Fed. R. Civ. P. 23

A class action is "a lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group." Anderson v. Weinert Enters., Inc., 986 F.3d 773, 776 (7th Cir. 2021) (citation omitted). It "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (citation omitted). To justify departing from that usual rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. at 348-49 (cleaned up). Ultimately, whether a class action is appropriate is governed by a two-step analysis under Fed. R. Civ. P. 23.

First, the action must satisfy "four threshold requirements" under Rule 23(a): "(1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997) (cleaned up).

Second, the action must satisfy Rule 23(b), which sets forth further "requirements for class actions depending on, among other things, the type of relief sought." Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago, 797 F.3d 426, 433-34 (7th Cir. 2015). In particular, the action must fall into at least one of three categories:

> (1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests),
>
> (2) an action seeking final injunctive or declaratory relief, or
>
> (3) a case in which the common questions predominate and class treatment is superior.

Spano v. The Boeing Co., 633 F.3d 574, 583 (7th Cir. 2011).

In addition to the Rule 23(a) and (b) requirements, a class must also "be sufficiently definite" such "that its members are ascertainable." Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc., 431 F. Supp. 3d 1003, 1010 (N.D. Ill. 2020) (cleaned up).

Plaintiff bears the burden to show that he is entitled to class certification. Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir. 2006). In assessing whether he has done so, the court is not limited to the complaint's allegations and should instead "make whatever factual and legal inquiries are necessary under Rule 23." Szabo v. Bridgeport Machs., Inc., 249 F.3d 672,

675-76 (7th Cir. 2001). In the end, the court has broad discretion to decide whether to grant class certification. Keele v. Wexler, 149 F.3d 589, 592 (7th Cir. 1998).

With these principles in mind, the court turns to plaintiff's proposed class here. Plaintiff seeks to have certified an "Easement Enforcement Class," which he defines as:

> All natural persons who, prior to the filing of this action, and according to the records of the Loch Lomond Property Owners Association ("LLPOA") or its agents, were sent one or more written demands, notices, or debt-collection letters (in the form of Exhibit 1, page 1) or had "Notice(s) of Revocation of Beach and Lake Access Privileges" (in the form substantially as Exhibit 1, page 2) filed against their properties, or were otherwise denied access to the Lake and Parks on the basis of purporting to enforce the "Amended and Restated Declaration of Restrictions and Easements for Loch Lomond Property Owners Association," and who owned non-lakefront lots within the original Loch Lomond subdivisions at the time of such correspondence. Excluded: lakefront and lake-adjacent (i.e. across the street from Lakefront properties); persons who purchased property after October 22, 2015; current or former LLPOA officers and directors; and/or any individuals identified in the Garesche objection petition (Dkt. 301).

Defendants assert several arguments opposing certification. The court addresses the parties' various arguments below.

<u>Whether the Proposed Class Impermissibly Differs from the Complaint</u>

The court begins with a procedural issue. Defendants argue that plaintiff's new proposed class has "changed drastically from the one pled in his Complaint": it "carve[s] out large swaths of residents he now understands he cannot represent," and adds new members—"including those who had 'Notices of Revocation' filed against their properties in ***2006***," years before this lawsuit and the 2015 Amended Declaration. (Emphasis by defendants). Defendants contend that "[s]eeking to amend the class definition in a motion for class certification is procedurally improper," and that the court should therefore reject certifying the class on this basis.

The court disagrees. "District courts may amend class definitions either on motion or on their own initiative." Beaton v. SpeedyPC Software, 907 F.3d 1018, 1023 (7th Cir. 2018) (rejecting defendant's argument that "the class definitions and legal theories covered by the court's certification orders impermissibly differ from those outlined in the original complaint"). And defendants have not shown how they have been prejudiced by a class that removes allegedly conflicted class members or that allegedly adds (by defendants' own count) a handful of members. Id. (explaining that the court could "see no reason" why the defendant was "prejudiced" by the narrowed class, and noting the defendant had not said "what exactly [it] would have changed" in discovery). The court thus moves to the other certification criteria.

Whether the Class is Ascertainable

Plaintiff argues that the Easement Enforcement Class is ascertainable "because the class members are readily identified from real estate records and Defendants' records maintained in the ordinary course of their operations"—which include "documents (delinquent ledger logs) produced as LLPOA 3311-3315, 3362-3428 & 3480-3542." Defendants do not dispute this. Nor does the court see why the class would not be ascertainable.

Whether Rule 23(a)'s Requirements are Met

Numerosity

Plaintiff "must show that his proposed class is so numerous that joinder of all members is impracticable." Anderson, 986 F.3d at 777 (cleaned up). Seventh Circuit "cases have recognized that a forty-member class is often . . . sufficient to meet the numerosity requirement." Id. (cleaned up). Yet a forty-member-plus proposed class "does not guarantee numerosity." Id. At bottom, it "is not the number of class members alone but the practicability of joinder" that

matters. Id. To determine whether the joinder would be impractical, courts evaluate "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." Id. (citation omitted).

Plaintiff argues here that the proposed class includes roughly 80 members, many of which have since relocated, and that "the relatively modest value of individual claims—approximately $350 per year—makes separate actions economically unfeasible." Defendants contend in opposition: that 80 is not that many people; that the claims are not "so small that individuals would not be motivated to bring suit"; that "[m]ost of the proposed class members are still residents in" the Loch Lomond subdivision—a "tight, geographic area"—and are "easy to locate" and contact; and that the "rest of the proposed class members are either deceased, or are former residents of this same geographic area that were identified during the notice phase of the prior settlement process."

The court finds that the numerosity requirement is met here. For starters, the proposed class is more than the 40-member number that courts have found is "sufficient to meet the numerosity requirement." Anderson, 986 F.3d at 777. That is so even if the 14 households who defendants argue did not also receive 2016 collection letters were not included in the class. Thus, while Anderson makes clear that numbers alone are not dispositive, the number here still supports that joinder would be impractical. So too does the information in the declaration that defendants attach to their opposition brief. Defendants' declarant states that 29 members of the class do not live in Loch Lomond, six individuals are deceased, and still others would be corporations or trusts. The claims at issue are also relatively modest. The court consequently agrees with plaintiff that it would be impractical to require "dozens of homeowners, estates, and

former residents to retain separate counsel and initiate parallel suits—after years of centralized discovery and motion practice."

Commonality and Typicality

Rule 23(a)'s "commonality and typicality requirements . . . tend to merge." Wal-Mart, 564 U.S. at 349 n.5 (citation omitted). That is because "both serve as guideposts for determining whether" maintaining a "class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. (citation omitted).[1]

As for commonality, the plaintiff must show that "there are questions of law or fact common to the class." Id. at 349 (quoting Fed. R. Civ. P. 23(a)(2)). This means that he must show that the class members' claims "depend upon a common contention." Id. at 350. "A question satisfies this commonality requirement if the same evidence will suffice for each member to make a *prima facie* showing on the question or the issue is susceptible to generalized, class-wide proof, and determination of the question's truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Schroeder v. Progressive Paloverde Ins. Co., 146 F.4th 567, 573 (7th Cir. 2025) (cleaned up). "[E]ven a single common question will do." Wal-Mart, 564 U.S. at 359 (cleaned up). In determining whether there are common questions, the "district court should begin by identifying the elements of the plaintiff's various claims" because "only by properly circumscribing the claims and breaking them down

[1] The commonality and typicality requirements "therefore also tend to merge with the adequacy-of-representation requirement." Id. (citation omitted). But, as explained further below, the adequacy requirement raises additional "concerns about the competency of class counsel and conflicts of interest." Id. (citation omitted).

into their constituent elements can a district court decide which issues are common, individual, and predominant." Simpson v. Dart, 23 F.4th 706, 713-14 (7th Cir. 2022) (cleaned up).

Here, plaintiff's relevant claims are for tortious interference (Count II), private nuisance (Count III), slander of title (Count IV), and trespass to easement (Count V). Generally, to prove a trespass of, or a tortious interference with, an easement, the plaintiff must show that it has an easement, and that the defendant intentionally and materially interfered with the plaintiff's right to reasonable use of the easement. See Downing as Tr. of James Downing Irrevocable Tr. v. Somers, 2023 IL App (4th) 220900, ¶¶ 21-30 (discussing "intentional interference with an easement"); Chicago Title Land Tr. Co. v. JS II, LLC, 2012 IL App (1st) 063420, ¶ 76 (discussing trespass "[i]n the context of an easement"). A nuisance claim similarly requires that the act complained of "invade another's interest in the use and enjoyment of his land," and that the "invasion must be substantial and either intentional or negligent and unreasonable." Wahlert, 2021 WL 5280942, at *5 (citation omitted).

As for slander of title, the elements are: "(1) a false and malicious publication by defendant, (2) that disparages plaintiff's title to the property, (3) and damages resulting from that publication." White v. Richert, No. 15 C 8185, 2016 WL 6139929, at *7 (N.D. Ill. Oct. 21, 2016); see also Pittsfield Dev., LLC v. Lynd, No. 19-CV-01321, 2021 WL 3618275, at *8 (N.D. Ill. Aug. 16, 2021) (a plaintiff asserting slander of title in Illinois must allege "a false and malicious publication, oral or written, of words which disparage its title to property resulting in special damages" (cleaned up)). "In Illinois, 'the act of maliciously recording a document which clouds another's title to real estate is actionable as slander of title.'" White, 2016 WL 6139929, at *7 (citation omitted).

Plaintiff argues that there are several common questions of law and fact. Plaintiff contends, for example, that the claims arise from a common nucleus of operative fact—the LLPOA's efforts to amend and restate the declaration, and to attempt to enforce the amended declaration by filing liens, sending collection letters, and blocking residents from the lake and park who refuse to pay dues. He also asserts that common issues of fact applied to law include: whether defendants' "practice of locking out putative class members that did not pay so called 'dues' from access to the Lake and Park (though the use of gates, requiring a fob, and guards that call the police) constitute a substantial and unreasonable interference with the easement rights all class members possess"; and whether defendants' conduct was willful, such that their recording of documents against property is slander of title. Plaintiff concludes that the evidence to prove his case would be "the same as in any class members' case": "the original CC&Rs, the 1961 Deed, the 1980 extension, LLPOA newsletters, 'welcome' letters, meeting minutes, website admissions, bylaws, collection letters, recorded lien documents, and, of course, the document at the heart of this entire dispute: the 2015 Recording."

For their part, defendants do not meaningfully dispute that there are common questions here. That is not surprising. Indeed, there are plainly common questions for the causes of action. A common question for the interference, private nuisance, and trespass to easement claims is whether defendants intentionally, substantially, and materially interfered with plaintiff's and the class members' easement rights by blocking access to the Lake and Park through the use of gates, a fob, and guards. And determining the answer to this question will require the same evidence and will resolve an issue that is central to the validity of each one of the claims in a single stroke. See Chicago Tchrs. Union, 797 F.3d at 434 ("What matters to

class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (emphasis in original) (citation omitted)).

As for slander of title, the court has already determined that the "heart of plaintiff's claims . . . is the Amended Declaration, by which the LLPOA attempted to add new covenants," to "declare every owner . . . to be a member of the association," to make the "provisions of the declaration . . . mandatory," and to strip the owners of "the right or power to disclaim, terminate or withdraw from the association." Wahlert, 2023 WL 5348757, at *4. The court also previously found that "a significant aspect of the case is whether defendants improperly recorded the invalid Amended Declaration, thereby slandering the individual class members' titles." Id. at *6. So answering whether the 2015 Amended Declaration and its recording were valid and lawfully enforced against the class members, will involve the same evidence and will resolve issues that are central to the class members' claims in a single stroke. The commonality requirement is thus met here.

Plaintiff's claims are also typical of the class. To be typical, the plaintiff's claims must have "the same essential characteristics" as the class members' claims. Muro v. Target Corp., 580 F.3d 485, 492 (7th Cir. 2009). For example, a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." Keele, 149 F.3d at 595 (citation omitted). "Typical does not mean identical, and the typicality requirement is liberally construed." Kurgan v. Chiro One Wellness Ctrs. LLC, No. 10-cv-1899, 2014 WL 642092, at *7 (N.D. Ill. Feb. 19, 2014) (citation omitted). It requires "enough congruence between the named

representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." Spano, 633 F.3d at 586.

Here, plaintiff's and the class members' claims have the same essential characteristics and arise from the same event, practice, or course of conduct—namely, defendants having unlawfully assessed dues, clouded titles by recording the Amended Declaration, and blocked access to the lake. Defendants argue that "[p]laintiff now includes in his class individuals who had a 'Notice of Revocation of Lake and Beach Access' filed against their properties, despite the fact that these actions occurred in 2006, and no such Notice of Revocation was ***ever*** filed against Wahlert's property." (Emphasis by defendants). As plaintiff points out, however, the "class is not defined by the date a revocation notice was first generated, but by whether Defendants later relied on revocation, denial of access, or recorded instruments as part of enforcing the 2015 Recording against non-lakefront easement holders." The claims therefore arise from the same practice or course of conduct and are based on the same legal theory.

Defendants also argue that the class includes members to which unique defenses might apply. According to defendants, the class includes six deceased homeowners, whose claims might be time barred and might not survive death of the residents, as well as the "Notice of Revocation" members, some of which "weren't living in Loch Lomond in 2015." But as plaintiff notes in reply, damages for an injury to real property survive death in Illinois and a cloud on title runs with the land. What is more, "[t]ypicality under Rule 23(a) should be determined with reference to the [defendant]'s actions, not with respect to particularized defenses it might have against certain class members." Wagner v. NutraSweet Co., 95 F.3d 527, 534 (7th Cir. 1996). Defendants' "unique defenses" argument therefore fails.

In sum, the court finds that the commonality and typicality requirements are met here.

Adequacy

The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. Plaintiff argues here that "[a]ll sources of potential conflict" that defendants identified in their motion to decertify the previously proposed Perpetual Easement Owner Class "have been removed by narrowing the class." "The remaining members," plaintiff contends, "share a uniform interest in clearing title and restoring their easement rights": "if Plaintiff prevails, every member benefits equally." Plaintiff also contends that his counsel is experienced, and that plaintiff and his counsel have diligently prosecuted this action since 2017.

Defendants do not meaningfully dispute these assertions. They instead "incorporate" their argument from their previous opposition to certification—that "plaintiff's 'extreme and idiosyncratic' animus towards the Association and the individuals associated with the Association" renders plaintiff an inadequate representative.

The court rejects defendants' "animus" argument for the same reasons it did before: plaintiff's disputes with defendants "have all been fueled by his efforts to prove that defendants have no right to prevent his (as well as other's) access to the lake"; and "[t]here is [still] nothing to indicate that the instant suit is 'fueled by the spite or hostility of an unduly antagonistic litigant or by some other ulterior motive or irrational purpose unrelated to the claims alleged in the complaint.'" Wahlert, 2023 WL 5348757, at *5 (quoting Kamean v. Loc. 363, Int's Bhd. Of Teamsters, Chauffers, Warehousemen & Helpers of Am., 109 F.R.D. 391, 395 (S.D.N.Y. 1986)).

In short, the court finds that plaintiff has satisfied Rule 23(a)'s four requirements.

Whether this case falls within a Rule 23(b) Category

Rule 23(b)(3)

Plaintiff first asserts that certification is appropriate under Rule 23(b)(3). Rule 23(b)(3) class actions are designed to "cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615 (cleaned up). Rule 23(b)(3) has two requirements: (1) predominance—that "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) superiority—"that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Predominance

"Rule 23(b)(3)'s predominance requirement builds on commonality." Svoboda v. Amazon.com Inc., 168 F.4th 956, 961 (7th Cir. 2026) (cleaned up). "While commonality requires that common questions exist, predominance requires that they also predominate" over individual questions. Id. As explained above for commonality, a common question is one where the "same evidence will suffice for each member to make a *prima facie* showing on the question or the issue is susceptible to generalized, class-wide proof, and determination of the question's truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Schroeder, 146 F.4th at 573 (cleaned up). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member." Ross v. Gossett, 33 F.4th 433, 439 (7th Cir. 2022) (citation omitted).

As with commonality, the court must identify the elements of each claim and the proof necessary for each. Svoboda, 168 F.4th at 961. But "Rule 23(b)(3) . . . does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." Chicago Tchrs. Union, 797 F.3d at 444 (quoting Amgen, 568 U.S. at 469). Rather, what ultimately matters, is that "the claims 'arise from a common nucleus of operative facts and issues,'" Svoboda, 168 F.4th at 961 (citation omitted)—that is, that "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication," Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815 (7th Cir. 2012) (cleaned up).

As discussed above for commonality, a common question for the interference, private nuisance, and trespass to easement claims is whether defendants intentionally, substantially, and materially interfered with plaintiff's and the class members' easement rights by blocking their access to the Lake and Park through the use of gates, a fob, and guards. Defendants argue that predominance is lacking because "[t]o recover anything other than nominal damages in a claim for trespass, a plaintiff must show evidence of actual harm," and that for nuisance, "damages are determined by the value of the 'loss of use' of each property, and the 'discomfort and annoyance' of the party who is harmed." (Citation omitted). These issues, they contend, raise individual questions. Defendants also assert that a "class member's failure to abide by their common law duties" to maintain "their easements" could "offset any alleged damages that they suffered"—another individual issue. And, defendants press, some "class members may be estopped from complaining about assessments in the first place," based on having purchased the property in question knowing that there would be assessments, providing a unique defense.

But as this court previously held: "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defense peculiar to some individual class members." Wahlert, 2023 WL 5348757, at *6 (quoting Hicks v. State Farm Fire & Cas. Co., 965 F.3d 452, 460 (6th Cir. 2020)); see also Chicago Tchrs. Union, 797 F.3d at 444 ("when adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate" (citation omitted)).

Defendants have picked at the margins of the trespass, interference, and nuisance claims, but the fact remains: the claims all "arise from a common nucleus of operative facts and issues," Svoboda, 168 F.4th at 961 (citation omitted)—namely, the 2015 Amended Declaration and interference with plaintiff's and the class members' easement rights—and the above common question represents a significant aspect of the case and can be resolved for all members of the class in a single adjudication, Messner, 669 F.3d at 815. To the extent that the issues that defendants identify even raise individual questions (plaintiff notes, for example, that the "maintenance obligation" issue would be "common to the class and resolved by uniform proof"), the common question predominates here. See Svoboda, 168 F.4th at 966 ("Even if individual questions about the remaining defenses and damages remain, they do not defeat class certification, particularly where other common questions predominate.")

As for slander of title, again, the elements of that claim include a false and malicious publication, that disparages plaintiff's title to the property, and special damages as a result. White, 2016 WL 6139929, at *7. And again, a common question is whether defendants

maliciously improperly recorded the Amended Declaration, which represents "a significant aspect of the" slander of title claim. Wahlert, 2023 WL 5348757, at *6. Plaintiff further points out that whether the recording disparages plaintiff's and the class members' titles is another common question.

As they did during the prior certification dispute, defendants latch onto the third element, arguing that the "special damages" issue presents individual issues that will overwhelm the common ones. But again, each "element of [the] claim" need not be "susceptible to classwide proof." Chicago Tchrs. Union, 797 F.3d at 444 (quoting Amgen, 568 U.S. at 469); see also Beaton, 907 F.3d at 1029 ("Speedy misreads Supreme Court precedent in arguing that *liability* with regard to all class members must be resolved in a single stroke." (emphasis in original)); Pella Corp. v. Saltzman, 606 F.3d 391, 394 (7th Cir. 2010) (per curiam) (affirming certification of a class to determine whether the class members' Pella-brand windows were defective, while leaving causation and damages for individual determination). The court finds that the common questions for slander of title predominate here.

In short, the court finds that predominance requirement is met here.

Superiority

To show that a Rule 23(b)(3) class action meets the superiority requirement, a "plaintiff must demonstrate that a class action is the most practical and efficient way to resolve the litigation." Svoboda, 168 F.4th at 961 (cleaned up). Relevant considerations include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Id. at 962 (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D)).

Plaintiff contends that these factors favor certification. He argues, for example, that "the class members do not have a strong interest in maintaining individual actions due to the relatively small amount in controversy ($350 annually) and the [defendants'] vigorous defense." This, he contends, is therefore a "classic Rule 23(b)(3) class." (Citation omitted).

Defendants do not meaningfully address the superiority issue. They do argue in other places in their brief that this is not a case where damages are so small that individuals would not be motivated to bring suit, noting that "separate homeowners previously brought their own suit based on similar allegations. (Citing Schultz v. Kovitz Shifrin Nesbit, Case No. 17-cv-8836 (N.D. Ill.)). But that was a single separate case, and this court dismissed it for want of prosecution. It thus provides little support for the notion that the class members would have an interest in controlling or maintaining individual actions.

At the end of the day, the court agrees with plaintiff that the class members do not have a strong interest in controlling individual actions, and that maintaining a class action in this court is superior given the years of centralized discovery and motion practice. The court accordingly finds that the superiority requirement is met.

In sum, the court finds that this case meets Rule 23(b)(3)'s requirements.

Rule 23(b)(2)

Plaintiff argues that the class should also be certified under Rule 23(b)(2). Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Colloquially, 23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." Chicago Tchrs. Union, 797 F.3d at 441. But that is not the only circumstance. Relevant here, a class may be certified under both Rule 23(b)(2) and 23(b)(3) "where there is a real basis for both damages and an equitable remedy." Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 895 (7th Cir. 2011).

Plaintiff argues that this is just the situation here. According to plaintiff, an "injunction is a permissible remedy in a trespass case" like this, and the court "should certify the injunctive, equitable, and declaratory relief portion of this case under Rule 23(b)(2)." In response, defendants argue that "the operative Complaint: requests 'actual, statutory, and punitive damages' and 'costs and reasonable attorneys fees'"—not "injunctive relief"—such that certification under Rule 23(b)(2) would be improper. Defendants also argue that because "the proposed class consists of both current residents, former residents, and several individuals who are deceased," "indivisible injunctive relief could not be granted to this proposed 'class.'"

Although plaintiff's arguments on Rule 23(b)(2) certification are rather sparse, the court finds that certifying the proposed class under Rule 23(b)(2) is appropriate here. As for the trespass, interference, and nuisance claims, in interfering with plaintiff's and the class members'

easement rights to the parks and lake, defendants "acted on grounds that apply generally to the class," such "that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Put simply, an order declaring that defendants' interference with plaintiff's and the class members' easement rights is unlawful and enjoining defendants from further interference, would apply on a classwide basis.

Similarly, for the slander of title claim, defendants acted on grounds that apply generally to the class when they recorded the Amended Declaration. And an order declaring that defendants maliciously improperly recorded the Amended Declaration would apply on a classwide basis.

Although defendants are correct that the complaint does not expressly request injunctive or declaratory relief, that does not prohibit certification. Rule 23(b)(2) focuses on the availability of final injunctive relief that will benefit the entire class—not on whether the complaint expressly requested injunctive relief. Cf. Berry v. Schulman, 807 F.3d 600, 611 (4th Cir. 2015) (noting that Rule 23(b)(2) "applies so long as '*final injunctive relief* . . . is appropriate respecting the class as a whole,'" and rejecting the argument that plaintiffs' failure to seek injunctive relief in their complaint "independently preclude[s] certification under Rule 23(b)(2)" (emphasis in original) (quoting Fed. R. Civ. P. 23(b)(2)); see also Fed. R. Civ. P. 54(c) ("final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). And declaratory and injunctive relief flow naturally out of the trespass, interference, or nuisance claims. See Downing, 2023 IL App (4th) 220900, at ¶ 40 (explaining that "injunctions are appropriate for even minor interference with an easement"

(citation omitted)). A declaratory judgment would also naturally flow from the slander of title claim.

Because damages may need to be dealt with separately here, the court does not see much daylight between certifying the class under Rule 23(b)(2) and Rule 23(b)(3). Nevertheless, the Seventh Circuit has endorsed similar hybrid certifications in other cases. See Chicago Tchrs. Union, 797 F.3d at 444-45 (certifying the same class under both Rule 23(b)(2) and (b)(3) where answering the same "single question" of whether the Board's policies unlawfully discriminated against African-American teachers would "would eliminate the need for repeat adjudication of this question for determinations of damages or individual injunctive relief," and certifying under Rule 23(b)(3) even though "individualized remedies and damages may have to be determined for each plaintiff"). The court sees no reason not to adopt that same approach here.

## CONCLUSION

For the reasons described above, plaintiff's renewed motion for class certification [348] is granted. The court certifies the Easement Enforcement Class as defined on page 14 above. Plaintiff is directed to email the courtroom deputy by September 25, 2026, a draft Notice to send to the certified class.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: September 11, 2026**